Filed 7/16/26  Razo v. Andersson CA4/3
Opinion following rehearing

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for
publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication
or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ALEXANDER RAZO et al., | |
| Plaintiffs and Respondents, | G063747 |
| v. | (Super. Ct. No. 30-2020-01158055) |
| MELISSA ANDERSSON, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Craig L. Griffin, Judge. Reversed. Appellant's request for judicial notice denied. Respondents' motion to strike denied.

Horvitz & Levy, Frederic D. Cohen, Jason R. Litt; Carney Mehr and Kendra L. Carney Mehr for Defendant and Appellant.

Plante Huguenin Lebovic Kahn, Brian C. Plante and Gregory M. Golino for Plaintiffs and Respondents.

*          *          *

This is a dispute between homeowners, Melissa Andersson on the one hand, and Alexander and Danielle Razo (the Razos) on the other, who live in adjoining units and who are the only two members of a homeowners association (the Association). Andersson wanted to make extensive changes to her patio and unit, some of which would have required changes to the Razos' walkway. The Razos were not agreeable, but Andersson proceeded anyway. The Razos filed the instant action claiming Andersson's changes violated the Association's Covenants, Conditions, and Restrictions (CC&Rs). The CC&Rs prohibited an owner from making changes to the "exterior appearance" of their home without Association approval. However, the CC&Rs allowed an owner to unilaterally make changes to certain areas, including a patio. The trial court expansively interpreted the "exterior appearance" language to include all of Andersson's changes—including modifications within her patio—and, thus, it entered judgment in favor of the Razos.

We conclude the trial court erred, in part. Andersson could make changes to her exclusive use common area, which included her patio, but could not make changes to the Razos' walkway, changes that affected the structural integrity of any portion of the property, or changes to the exterior surface of her unit. We therefore reverse the judgment and remand for the trial court to enter a new and different judgment consistent with this opinion.

FACTS

The CC&Rs were recorded in 2001. Their recital stated their purpose was to "enforc[e], protect[] and preserv[e] the value, desirability and

attractiveness of the Project." The CC&Rs defined the "'Project'" as a "'Condominium Project,'" and the "'Property'" as a "'Common Interest Development.'" The "'Property'" included the real property (Property) upon which the Razos' and Andersson's "Units" were situated. The CC&Rs defined a "'Unit'" by reference to former Civil Code section 1351, subdivision (f). That section defined a "Unit" as a "separate interest in space . . . the boundaries of which are described on a recorded final map." (Former Civ. Code, § 1351, subd. (f), amended by Stats. 2000, ch. 26, § 1, and repealed by Stats. 2012, ch. 180, § 1, eff. Jan. 1, 2014.) Their description may refer to "physical boundaries, either in existence, or to be constructed, such as walls, floors, and ceilings." (*Ibid.*) On the recorded final map here, the boundaries of each Unit were depicted by lines identified as "walls." The Property also contained "'Common Area'" and "'Exclusive Use Common Area(s).'" Everything on the Property, other than a Unit, was Common Area. Exclusive Use Common Area sat within Common Area, but was space designated for an owner's exclusive use, such as a patio.

The Property and Units were built in approximately 2002. The Razos purchased their Unit in 2017. Andersson purchased her Unit in January 2020. The Units and Property were located between a street and an alley. Andersson's Unit faced the street and a sidewalk, while the Razos had the rear Unit. Andersson's Unit included an outdoor patio which was visible from the street and was designated her Exclusive Use Common Area.

A walkway began at the street's sidewalk, meandered along the left side of the Property, and ended at the entrance to the Razos' Unit. A separate walkway also started at the sidewalk but led to Andersson's patio and ultimately to her front door. Each walkway had its own gate. The walkways were adjoined and separated by pilasters which were connected by

3

a wrought iron fence. On the right of the wrought iron fencing was Andersson's patio and walkway; immediately to the left was a decorative planter, and to the left of that was the Razos' walkway. There were also three pilasters, connected by wrought iron fencing, that ran across the front of the Property, parallel to the sidewalk and street.

According to the recorded final map, Andersson's Exclusive Use Common Area was supposed to begin 50 inches from the left-side Property line. However, as it was at the time Andersson purchased her Unit, the Razos' walkway, including the planter, pilasters, and wrought iron fencing, reached 85 inches from the left-side Property line and, thus, encroached on Andersson's Exclusive Use Common Area.

A month after moving in, Andersson met with Eric Fenmore and his company, DIG Landscape Construction, Inc., dba Garden Studio with the hopes of remodeling her patio. She wanted to change the aesthetic from a "traditional Mediterranean design" to a "clean coastal look." In addition, as part of the remodel, Andersson wanted a walkway that led right to her door. To that end, Andersson's plans called for (among other things) expanding her patio to its originally delineated starting point 50 inches from the left-side Property line. To make way for Andersson's new walkway, she proposed to remove (1) the planter in front of the right pilaster that flanked the Razos's gate, (2) a pilaster that adjoined that planter (and sat in front of the right gate pilaster), and (3) the wrought iron fencing that ran along the right side of the Razos's walkway. Andersson proposed to replace that wrought iron fence (and the removed pilaster) with a new wall that would form the boundary of Andersson's newly expanded patio. She ultimately left the Razos's gate (and the two pilasters supporting it on either side) as it was.

In addition to this, Andersson wanted to remodel her patio to remove an outdoor fireplace, install an outdoor firepit with seating, replace doors and windows, change the stucco and paint on her Unit, install a barbeque, change the planting and hardscape, and remove the three pilasters and wrought iron fencing which ran across the front of the Property and parallel to the sidewalk and street, amongst other things.

Andersson signed a contract with DIG whereby she agreed to indemnify DIG from any claims, including attorney fees.

The Razos were not agreeable to any of Andersson's proposed changes. Notwithstanding, Andersson instructed DIG to commence work. DIG ultimately made changes to Andersson's patio, including installing a fireplace, stonework, plants, and a bench. In addition, DIG installed a barbecue on the right side of the Property by removing stucco on the exterior of Andersson's unit, installing the barbecue in place of the stucco, removing the stucco around the new barbecue, and replacing that with a tile backsplash. DIG altered the Razos' walkway, removed the planter, and the wrought iron fencing which ran adjacent to the planter including a pilaster connected to the fencing, but did not remove the Razos' gate or the pilasters that flanked it. DIG also removed three pilasters that ran parallel to the sidewalk and street in the front of the Property and replaced them with a low wall with a low wooden fence in front of it. DIG also changed the color and texture of the stucco around the windows and doors of Andersson's Unit.

In August 2020, the Razos sued Andersson, DIG, and Fenmore for breach of the CC&Rs, prescriptive and equitable easements, and nuisance. DIG filed a cross-complaint against Andersson asserting causes of action for breach of contract, contractual indemnification, and equitable

5

indemnity. Prior to trial, DIG and the Razos settled, and DIG assigned its claims to the Razos.

At the heart of the Razos' complaint were two CC&Rs: section 2.04(d), which prohibited an owner from changing "the exterior appearance of a Unit" without Association approval, and section 2.04(e), which allowed an owner to unilaterally make "any improvement or alteration" to the owner's Exclusive Use Common Area, so long as it did not impair the structural integrity or lessen support of any portion of the Property.

Andersson and the Razos proceeded to a court trial where they each introduced experts who testified to the meaning of the CC&Rs at issue. Andersson's expert, an attorney specializing in homeowner associations, testified that, based on his reading, the Association was not required to approve changes to an owner's Exclusive Use Common Area. He did not believe section 2.04(d) had any application to the dispute between the Razos and Andersson because, in his opinion, Andersson did not make changes to her Unit's "exterior appearance."

The Razos' expert, a real estate lawyer, interpreted the phrase "exterior appearance," to refer broadly to the exterior appearance of the Property, including Exclusive Use Common Area, not just the Unit itself. Thus, the CC&Rs barred Andersson's changes to her patio, as well as the Razos' walkway, because they altered the Property's exterior appearance.

The trial court agreed with the Razos' expert and concluded that because the "express purpose of the CC&Rs [was] to 'protect[] and preserv[e] the value, desirability and attractiveness of the [Property],'" then it would be unreasonable to conclude that the drafter intended to give owners the power to unilaterally change the appearance of their Exclusive Use Common Area because such lack of uniformity within the Property would diminish its

6

"value, desirability, and attractiveness . . . ." Because, the court continued, "[s]ection 2.04(d) is the only provision expressly addressing [Association] approval for exterior changes," then it must be interpreted "expansively to require [Association] approval for changes to any portion of the exterior of the [Property]." As such, all of Andersson's changes breached the CC&Rs.

Alternatively, the court ruled the Razos had an easement over their walkway, including the pilasters, planter, and wrought iron fencing, all on the left side of the Property. Section 10.04(a) of the CC&Rs stated that if, when the Property was originally constructed, an improvement was placed in such a way that it encroached on an owner's Exclusive Use Common Area, an easement was created over the encroaching area. The court found the Razos' walkway, and the adjoining planter, pilasters, and wrought iron fencing were part of the original construction.

Finally, the court ruled that Andersson was responsible for defending and indemnifying DIG and Fenmore.

In February 2024, judgment was entered ordering Andersson, at her expense, to undo the changes and to pay the Razos $762,822.24.

DISCUSSION

On appeal, Andersson argues the trial court erred in concluding that "exterior appearance" included the changes made to the appearance of her Exclusive Use Common Area. On this point, we agree. However, we disagree with Andersson's contentions that the Razos did not have an easement over their encroaching walkway, and the adjoining planter, pilasters, and wrought iron fencing, and that she is not responsible for defending and indemnifying DIG.

Finally, we conclude the trial court correctly determined that Andersson could not make changes to the exterior surface of her Unit without

Association approval and that substantial evidence supports the conclusion that Andersson's removal of the three pilasters which ran across the front of the Property, parallel to the sidewalk and street, impaired the structural integrity of the Property.

I.

ANDERSSON COULD ALTER HER EXCLUSIVE USE COMMON AREA

We interpret CC&Rs in the same manner as any contract, "with a view toward enforcing the reasonable intent of the parties." (*Harvey v. The Landing Homeowners Assn.* (2008) 162 Cal.App.4th 809, 817.) "The language of the CC&R's governs if it is clear and explicit, and we interpret the words in their ordinary and popular sense unless a contrary intent is shown." (*Ibid.*) Such contrary intent may be shown by extrinsic evidence shedding light on the ""facts, circumstances and conditions surrounding the execution of the [CC&Rs].'" [Citations.]" (*Falkowski v. Imation Corp.* (2005) 132 Cal.App.4th 499, 506.)

If the parties offered extrinsic evidence, and that evidence was not in conflict, we review the CC&Rs de novo. (*Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 531.) If the extrinsic evidence was in conflict and required credibility determinations by the trial court, we defer to the trial court's interpretation if substantial evidence supports it. (*Id.* at pp. 531–532.)

The Razos argue the experts' testimony constituted extrinsic evidence and, thus, we are bound by the trial court's reliance thereon if substantial evidence supports it. But the experts did not testify to the facts, circumstances, or conditions surrounding the execution of the CC&Rs. (See e.g., *Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1357 [evidence of trade usage and custom at time of contract admissible].) Instead, the experts

8

just presented their interpretations of the CC&Rs, a solely legal function. This is not extrinsic evidence. (*Gilkyson v. Disney Enterprises, Inc.* (2021) 66 Cal.App.5th 900, 920–921 [experts testifying to their interpretation of agreement is not extrinsic evidence].)

As such, the experts' conflicting interpretations, whether relied on by the trial court or not, are not binding on us, even if substantial evidence supports one of the interpretations. Instead, we interpret the CC&Rs de novo.

Section 2.04(d) is not ambiguous. The Units are bound by their walls. Walls have an interior and an exterior. "[E]xterior appearance" just refers to the appearance of the Unit's exterior walls. For example, an owner could not paint the exterior walls a different color or change their texture, nor could an owner install windows or add a balcony, without Association approval.

Similarly, section 2.04(e) is not ambiguous. By its plain terms, it permits an owner to alter their Exclusive Use Common Area without Association approval if it does not affect structural integrity or lessen support of the Property.

Additional support is found elsewhere in the CC&Rs. Section 2.04(c), for example, requires an owner to "notify the Association of any substantial improvements to the Unit and Exclusive Use Common Area(s), if any, in consideration of any effect of such improvements on the Association's insurance policy." Thus, per section 2.04(c), the CC&Rs contemplate a scenario in which the owner of a Unit makes "substantial improvements" to their Exclusive Use Common Area without the approval of the other owner, i.e., without Association approval.

Moreover, section 2.05 provides that "the Association (not individual Owners) is responsible for maintaining, repairing, modifying, and

9

altering Common Areas (not including Exclusive Use Common Areas)." Thus, the Association has no power to alter Exclusive Use Common Areas—that domain lies with the owner.

The Razos disagree and urge us to focus on the CC&Rs' recital which explains that the purpose of the CC&Rs is to maintain the desirability and attractiveness of the Units and Property. They believe section 2.04(e) must be read in such a way that it limits an owner's ability to change their Exclusive Use Common Area if doing so would decrease the "value, desirability and attractiveness" of the Property. Such an interpretation would inevitably embroil the owners in endless disputes over minor changes.

In any event, recitals are not covenants. Nor can they affect unambiguous covenants within the contract, such as 2.04(d) and (e). (*Carolina Beverage Corp. v. FIJI Water Co., LLC* (2024) 102 Cal.App.5th 977, 990.) This is why we give recitals "'limited effect[,] even as between the parties.'" (*Sabetian v. Exxon Mobil Corp.* (2020) 57 Cal.App.5th 1054, 1069.)

II.

REMOVING THE THREE PILASTERS WHICH RAN PARALLEL TO THE SIDEWALK AND STREET IN THE FRONT OF THE PROPERTY IMPAIRED THE STRUCTURAL INTEGRITY OF THE PROPERTY

Andersson argues the trial court erred in concluding that her actions in removing the three pilasters which ran across the front of the Property, and adjacent to the sidewalk and street, impaired the structural integrity of the Property. We disagree.

Section 2.04(e) provides that an owner may "[m]ake any improvement or alteration within the Unit and its Exclusive Use Common Area (if any) that does not impair the structural integrity or mechanical systems, or lessen the support of any portion of the Property." The CC&Rs

10

define "'Property'" as the "real property described in Paragraph 'A' of the Recitals to this Declaration." Real property is defined as "1. Land; [and] [¶] 2. That which is affixed to land." (Civ. Code, § 658.) When deciding if something is affixed to the land, we consider three factors: (1) its physical attachment to the land; (2) its adaptation so it may be used with the land; and (3) any intention to attach it to the land. (*Vieira Enterprises, Inc. v. City of East Palo Alto* (2012) 208 Cal.App.4th 584, 597 (*Vieira Enterprises*).)

The Razos called an expert who explained that pilasters are constructed by digging a hole 12 inches below grade, placing rebar within the hole, placing a concrete footing at the bottom of the hole, and then layering the foundation with concrete masonry units or blocks. The resulting pilaster is intended to be a permanent structure. The expert also testified that wrought iron was connected to the pilasters at issue forming a fence. This wrought iron fencing was bolted to posts which were placed and bolted into the pilasters. The wrought iron fencing was also intended to be permanent improvements.

The expert testified that removing the pilasters and attached fencing would lessen the support of a portion of the Property because it would remove the foundation for the pilasters which was the support for the pilasters and wrought iron fencing.

There is substantial evidence in the record to support the conclusion that the three pilasters were affixed to the land. The pilasters were physically attached to the land as they were installed beneath the soil with rebar, concrete footings, and concrete blocks. (*Vieira Enterprises, supra*, 208 Cal.App.4th at p. 599 [object attached to land when it is "'permanently attached' 'by means of cement . . .'"].) Moreover, these pilasters and the wrought iron served a purpose "for which the realty [was] used." (*Morse*

11

*Signal Devices v. County of Los Angeles* (1984) 161 Cal.App.3d 570, 578.) They formed a fence and boundary for the Units and Property. Finally, the evidence demonstrates that the pilasters were intended to be permanently attached to the land.

Although the CC&Rs do not define "structural integrity," the term is generally understood as an object's soundness or load-bearing ability. (See e.g., *Cabrini Villas Homeowners Assn. v. Haghverdian* (2003) 111 Cal.App.4th 683, 694–695 [substantial evidence supported trial court's conclusion that installation of an air conditioning unit impaired structural integrity of building because it would affect the building's "lateral load resisting system"; *Stevenson v. San Francisco Housing Authority* (1994) 24 Cal.App.4th 269, 279, fn. 6 [noting that federal regulations for public housing which require such housing to not have any serious defects that would cause the walls or floors to buckle or noticeably move are aimed at "provid[ing] standards for the structural integrity of [public] housing"]; Health & Saf. Code, § 55000 [Legislature's finding that many buildings do not have the structural integrity to "safely withstand seismic forces"]; Educ. Code, § 81133.5, subd. (a) [state "may issue a stop work order when construction work on a community college . . . would compromise the structural integrity of the building, thereby endangering the public safety"].)

Here, the sole expert on the topic opined that removal of the pilasters substantially impaired their structural integrity, and the structural integrity of the wrought iron fencing. As such, there was substantial evidence to support the trial court's conclusion that the pilasters were a part of the Property, that their removal affected their structural integrity, and that Andersson could not remove them without Association approval.

## III.

### THE RAZOS HAD AN EASEMENT

The recorded final map depicted Andersson's Exclusive Use Common Area as starting 50 inches from the left-side Property line. However, during construction of the Property, the builder installed a larger walkway to the Razos' Unit, by an additional 35 inches. This included the adjoining pilasters, planter, and wrought iron fencing that encroached Andersson's originally delineated Exclusive Use Common Area.

Sections 10.04(a) and (b) state that if, during original construction, an improvement is placed in such a way that it encroaches on an owner's Exclusive Use Common Area, an easement is created in favor of the encroaching owner. Andersson argues substantial evidence does not support the trial court's conclusion that the encroaching walkway, pilasters, planter, and fence were part of the Property's original construction and, even if they were, "the record does not support the conclusion that the entire walkway was an easement that encroached on Andersson's Exclusive Use Common Area." We disagree.

We review a trial court's factual findings for substantial evidence, a highly deferential standard. (*Ridley v. Rancho Palma Grande Homeowners Assn.* (2025) 114 Cal.App.5th 788, 800.) We will not reweigh the evidence, resolve evidentiary conflicts, or evaluate the credibility of witnesses. (*Ibid.*) Instead, we review the record in the light most favorable to the trial court's factual findings, giving the trial court the benefit of every reasonable inference. (*Ibid.*)

Prior to trial, the parties stipulated that the Property and the Units were constructed in "approximately 2002." The Razos presented a photograph from 2003 which depicted the disputed area in a similar fashion

to when they purchased their Unit in 2017. Although the picture is blurry and subject to interpretation, the trial court concluded that it was consistent with how the Razos' walkway stood at the time of purchase; we take no issue with that conclusion. In addition, there was evidence that the same style of wrought iron fence was used throughout the Property, that the pilasters had the same stucco finish as the Units, and that the age and look of all the improvements in the encroaching area were consistent with the rest of the Property. This constitutes circumstantial evidence that the encroaching improvements were part of the original construction. (*LaMarr v. Regents of University of California* (2024) 101 Cal.App.5th 671, 676 [circumstantial evidence is substantial evidence].)

Andersson also argues that because neither owner could walk through the planted areas, the area did not encroach on Andersson's Exclusive Use Common Area. Andersson's argument belies the point of a fence—to separate two areas and to delineate a border. Andersson's Exclusive Use Common Area was to the right of the fence and everything to the left was the encroaching improvements, including the planter and the 85-inch walkway.

Because there was an easement in favor of the Razos over the wider entryway, adjoining pilasters, planter, and wrought iron fencing, Andersson could not remove or modify those areas without Association approval.

IV.

ANDERSSON WAS RESPONSIBLE FOR DEFENDING AND INDEMNIFYING DIG

Last, Andersson argues the trial court erred in concluding that she was responsible for defending and indemnifying DIG. She claims DIG was not licensed when DIG performed the work at issue. Because of this,

14

according to Andersson, DIG's contract, including its indemnity provision, was illegal.

However, Andersson did not raise this defense at trial. "'"As a general rule, theories not raised in the trial court cannot be asserted for the first time on appeal; appealing parties must adhere to the theory (or theories) on which their cases were tried. This rule is based on fairness—it would be unfair, both to the trial court and the opposing litigants, to permit a change of theory on appeal." [Citation.] "New theories of defense, just like new theories of liability, may not be asserted for the first time on appeal . . . ."'" (*Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 548.)

This rule is especially apt here because resolving this issue would require us to make factual determinations utilizing evidence that Andersson did not present at trial. As part of her appeal, Andersson submitted a request for judicial notice pertaining to DIG's licensing documentation. But she did not present these materials to the trial court. We are not a fact-finding tribunal. Our role is limited to reviewing "'the correctness of a judgment as of the time of its rendition.'" (*In re Zeth S.* (2003) 31 Cal.4th 396, 405), Thus, we will not take notice of documents not presented to the trial court. (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.)

For these reasons, Andersson cannot assert this defense for the first time on appeal.

## DISPOSITION

The judgment is reversed. On remand, the trial court is directed to enter a new judgment, consistent with this opinion. The court is also ordered to reassess the amount of attorney fees the Razos are entitled to receive. (*Gunther v. Alaska Airlines, Inc.* (2021) 72 Cal.App.5th 334, 358–359.)

15

All parties to bear their costs incurred on appeal.


SANCHEZ, J.

WE CONCUR:


MOTOIKE, P. J.


GOODING, J.